```
1              IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
2                      EASTERN DIVISION

3
      UNITED STATES OF AMERICA,        )  Case No. 10 CR 647
4                                      )
                        Plaintiff,     )
5                                      )
                                       )
6     -vs-                             )  Chicago, Illinois
                                       )  January 30, 2014
7                                      )  10:30 o'clock a.m.
      ISAAC MYLES,                     )
8                                      )
                        Defendant.     )
9

10           TRANSCRIPT OF PROCEEDINGS - SENTENCING
            BEFORE THE HONORABLE JOHN W. DARRAH
11
    APPEARANCES:
12
    For the Plaintiff:       HON. PATRICK J. FITZGERALD
13                           United States Attorney
                             BY:  MS. SHOBA PILLAY
14                           Assistant United States Attorney
                             219 South Dearborn Street
15                           Chicago, Illinois 60604

16  For the Defendant:       LAW OFFICES OF BEAU B. BRINDLEY
                             BY:  MR. BEAU B. BRINDLEY
17                                MR. MICHAEL JAMES THOMPSON
                             53 West Jackson Boulevard
18                           Suite 1410
                             Chicago, Illinois 60604
19
    ALSO PRESENT:            MR. TROY GROOMS
20                           United States Probation Officer

21
                     Mary M. Hacker
22                Official Court Reporter
               United States District Court
23         219 South Dearborn Street, Suite 1212
                 Chicago, Illinois  60604
24              Telephone:  (312) 435-5564

25
```

1     (Proceedings had in open court:)

2          THE CLERK:  10 CR 647, United States versus Isaac

3     Myles.

4          MS. PILLAY:  Good morning, your Honor.  Shoba

5     Pillay for the United States.

6          MR. BRINDLEY:  Good morning, your Honor.  Beau

7     Brindley and Michael Thompson on behalf of Isaac Myles, who

8     is in custody, Judge.

9          THE COURT:  Good morning, Mr. Brindley.  Good

10     morning, Mr. Thompson.

11          MR. THOMPSON:  Good morning.

12          THE COURT:  Good morning, Mr. Myles.

13          THE DEFENDANT:  Good morning, Judge.

14          THE COURT:  This matter comes on for sentencing.

15          Could I ask the Probation Department to identify

16     themselves?

17          PROBATION OFFICER:  Good morning, your Honor.  Troy

18     Grooms, G-R-O-O-M-S, from Probation.

19          THE COURT:  Good morning, Mr. Grooms.

20          Mr. Grooms, I have your presentence investigation

21     report and the supplemental report.  You did a very fine job

22     and I benefitted from all the work you put in.  Thank you.

23          PROBATION OFFICER:  Thank you.

24          THE COURT:  Mr. Myles, have you received a copy of

25     the presentence investigation report?

1          THE DEFENDANT:  Yes, Judge.

2          THE COURT:  Have you read it?

3          THE DEFENDANT:  Yes.

4          THE COURT:  Have you received a copy of the

5    supplemental report?

6          THE DEFENDANT:  Yes.

7          THE COURT:  Have you read that as well?

8          THE DEFENDANT:  Yes.

9          THE COURT:  All right.  I read the presentence

10   investigation report, the supplemental report.  I read the

11   sentencing letters submitted by you, Mr. Brindley, on behalf

12   of your client, and I'm going to discuss those.

13          I read a letter from Pastor Roberts, who speaks

14   highly of your character, Mr. Myles.  He says he knows your

15   family, that he's known your mother for awhile, for eight

16   years; that he found you to be a respectful and congenial

17   young man that did not display the kind of character that

18   brought him to the present circumstances.  He says he knows

19   that you have high hopes for establishing a more noble and

20   productive life for yourself and one that can be morally

21   beneficial to those around him.

22          I have a letter from your mom -- are you here,

23   Mrs. --

24          MR. BRINDLEY:  She is, your Honor.

25          MRS. MYLES:  I'm here, your Honor.

1          THE COURT:  Good morning.

2          MRS. MYLES:  Good morning.

3          THE COURT:  I have a letter from your mother.  It's

4  very touching.  It talks about when you lost your father as a

5  young boy, that you were raised in a single parent home with

6  two other children; that you attended Resurrection Grammar

7  School and Weber High School, where you were a very fine

8  athlete, apparently, but because of financial troubles you

9  had to leave Weber and that's when she began to see a change,

10  a negative change in you.

11          She points out that she's been working in law

12  enforcement all her professional life, 36 years.  She never

13  thought that she would be on the other side of the fence.

14  She talks about her own age and how she would like to be able

15  to spend some quality time with her son.

16          I have a letter from your son, Javaris Perry, who

17  talks about you as a loving and supportive father; that he

18  will deeply miss your wisdom and guidance.  It says that most

19  of my father's problems were the result of his addiction to

20  narcotic -- addiction to drugs and asks that I would be

21  lenient in imposing a sentence.

22          I have a letter from your older brother, Kimberly

23  -- older sister, Kimberly Bright.  She refers to you as her

24  little brother.  She says your family, although you were

25  raised only by your mom, was full of love.  She has fond

1    memories of you as a young boy, watching you play basketball

2    and Little League, that you do have a close-knit family, the

3    impact that this is going to have on the family, particularly

4    your mother, who is in her mid 70s.  She points out that you

5    were a positive influence on her children's lives, both of

6    whom are college graduates.  And she asks for mercy in the

7    sentence that is to be imposed.

8              I have a letter from your aunt, Venus Black?

9              MR. BRINDLEY:  Yes.

10             THE COURT:  And she talks about your dreams to be a

11   professional basketball player; that you were very close to

12   your family, particularly your grandmother and your uncles;

13   that the loss of your grandmother, she thought, had a

14   negative impact on your life because your mother was

15   supporting the family and wasn't always available.  And she

16   says -- points out what she believes to be positive qualities

17   that you possess.

18             I have a letter from Reggie Brown, that you both

19   attended grammar school together, played basketball together;

20   talks about playing at Resurrection and a coach there that

21   gave you both direction.  He says he doesn't believe you have

22   a malicious bone in your body.  He thinks you believe -- he

23   believes you've learned a serious life lesson.

24             I have a letter from Carl Brandon, also

25   characterizes himself as best friends with you for the last

1   30 years.  Your name is in the newspaper all the time

2   regarding basketball, shooting jump shots late at night in

3   the dark until you had to come in; characterizes you as a

4   loving and caring person -- loving, caring and concerned

5   person when it comes to his mother, his kids and his family

6   and friends.  I'm writing this letter for his mother and his

7   kids.

8           And then I have a long, very well-written letter

9   from Denise -- is that Reinschfeber?  Reinschfeber?

10          THE DEFENDANT:  Reinschfeber, your Honor.

11          THE COURT:  Reinschfeber.  You've been best friends

12  for several years, and she believes that the downside -- the

13  downfall in your life started when you started using drugs;

14  it clouded and distorted your thinking; that you have been,

15  in spite of that, a positive role model to your children;

16  that you always express concern for your family.

17          It points out that you've been incarcerated for

18  four years now and removed from your family members.  She

19  believes that you have resolved to lead a better life.  She

20  believes you've learned the importance of freedom and how one

21  wrong decision can affect the people around you.

22          She tells me that you're a member of Garfield Park

23  Community Church.  I think later in the letter she talks

24  about some day joining the church that your mother is a

25  parishioner of; that you now understand the importance of God

1    in your life; that you plan on furthering your education once

2    you have achieved your G.E.D.

3              He's not achieved a G.E.D. yet, is that correct?

4              MR. BRINDLEY:   He was very close, Judge.  We

5    submitted -- I think the --

6              THE COURT:  I saw that.

7              Has he achieved a G.E.D. yet?

8              MR. BRINDLEY:   No.

9              THE COURT:  Okay.

10             She believes that you've learned from your

11   mistakes.  She talks about the church that she and her mother

12   -- your mother attend; the church is committed to second

13   chances for those who have been incarcerated or those who

14   have lost their way.

15             All very touching letters and they paint a very

16   positive side of your personality.

17             I read the objections -- I read your sentencing

18   memorandum, Mr. Brindley.

19             MR. BRINDLEY:  Yes, Judge.

20             THE COURT:  And you apply the 3553 factors to

21   Mr. Myles' life as well as the offense and his role in the

22   offense.

23             You talk about he was an exceptional high school

24   player and that things went bad when he had to leave and

25   transfer.  It was around this time that he was first exposed

1   to drugs; that his criminal history reflects his serious

2   addiction by way of numerous arrests and conviction for drug

3   possession in small user quantities; and that when he did

4   sell drugs, you argue it was clear that he was doing that to

5   promote his habit or support his habit.

6          You point out that since he's been incarcerated

7   he's used his time wisely, began the path to obtain a G.E.D.,

8   and as you just mentioned a moment ago, he's come very close.

9          You point out that he's 45 years old, that a

10  significant sentence will take the productive years of his

11  life.

12         And in discussing deterrence, you argue that a

13  sentence of ten years is a very harsh sentence, that he'll be

14  in his mid 50s when he is released and still be able to play

15  a meaningful role in his sons's life, but that that would be

16  a sufficient deterrence.

17         You also say that ten years is sufficient time,

18  would force an extended period of sobriety and would assist

19  him in overcoming his addiction to drugs and alcohol --

20  drugs.

21         You argue that a sentence of that duration does

22  reflect the seriousness of the offense and promotes the

23  interest of justice, and conclude by asking the Court to

24  consider a sentence between 120 and 144 months.

25         The government's sentencing papers focus on the

1    life of crime that Mr. Myles has led since he was a young

2    man.

3            At the age of 19 he was involved in an altercation

4    involving the use of a knife to steal cash and cars -- keys

5    of an automobile and was convicted of that offense.  Two

6    years later he violated his probation -- his parole by

7    distributing cocaine and distributing a quantity of heroin.

8    He was convicted and sentenced to seven years.

9            He was, in October of 2002, six months after his

10   parole on the narcotics violation, was discharged.  He used a

11   .357 revolver to shoot a victim in the foot while stealing

12   drugs from him, was convicted of aggravated battery with a

13   firearm and sentenced to six years.  December 4th of 2007 was

14   caught with a fully loaded .45 caliber automatic weapon,

15   handgun.

16           While on pretrial release from these gun charges,

17   on December 16th of 2009 he was caught preparing and

18   packaging heroin for distribution while storing a fully

19   loaded gun under his mattress.

20           You point out in your papers that contrary to many

21   of the people that, unfortunately, we see in here, that you

22   were blessed with an excellent childhood.  Your mother was

23   employed in law enforcement.  You had the advantage of at

24   least two years of a private high school education and eight

25   years of a private grammar school education; that your family

1    provided a supportive environment, and that's obvious from

2    the letters that have been written here.  And the government

3    argues that you chose to engage in violent criminal

4    misconduct in spite of these advantages that you had.

5          In discussing the 3553 factors, particularly the

6    seriousness of the offense, the need to promote respect for

7    the law, provide just punishment and afford adequate

8    deterrence, the government points out that your offense

9    combines a very dangerous combination of firearms and

10   narcotics and asks the Court to consider the threat that

11   these two things individually, and in particularly in

12   combination, provide in a community, your community in which

13   you lived.  And then, Ms. Pillay, you ask for a sentence

14   within the guideline range.

15         You also provided a supplemental -- I read your

16   version of the offense, which was attached to the presentence

17   investigation report, as well as your version of the offense,

18   Mr. Brindley.

19         MR. BRINDLEY:  Yes, your Honor.

20         THE COURT:  And then the government also provided a

21   supplemental version of the offense, which provides some

22   support for the criminal history that was unsupported in the

23   original presentence investigation report.

24         The presentence investigation report has determined

25   that the total offense level is a 32, with a criminal history

1    category of 6.  The presentence investigation report

2    determines that the offense level for the offenses would have

3    been a 24 but becomes a 34 because the defendant becomes a

4    career criminal because he -- pursuant to 4B1.1, because he

5    had at least two prior convictions -- felony convictions for

6    either a crime of violence or a controlled substance.

7            The presentence investigation report then goes on

8    to determine that pursuant to 4B1.4, the defendant could be

9    properly characterized as an armed career criminal if the

10   defendant is convicted of at least three prior convictions

11   for a violent felony or serious drug offense.

12           If that's the case, a mandatory minimum sentence of

13   15 years must be imposed.  And the presentence investigation

14   report determines that there were three predicate offenses

15   for an armed career criminal status and finds that the total

16   offense level is -- that the offense level is 34, subtracts

17   two levels for acceptance of responsibility and concludes

18   that the total offense level is a 32.

19           The government in their sentencing memorandum

20   acknowledges that the total offense level is a 34 and finds

21   that the two-level reduction of acceptance of responsibility

22   is not appropriate and holds that the total offense level

23   should be 34.

24           Is that right, Ms. Pillay?

25           MS. PILLAY:  No, your Honor.  I agree that --

1      THE COURT:  You agree that --

2      MS. PILLAY:  -- acceptance of responsibility, just

3  that the third point is not appropriate because we went to

4  trial.

5      THE COURT:  Right.  And because you went to trial,

6  the government has declined to exercise their discretion to

7  ask for the additional point.

8      MS. PILLAY:  Correct, your Honor.

9      THE COURT:  Mr. Brindley, you submitted a

10  memorandum on two issues.  The first issue is whether or not

11  the two-level reduction is appropriate even though you went

12  to trial.  And you point out that you conceded in the opening

13  statement that the guilt -- the defendant was guilty of two

14  of the three offenses the jury was going to be asked to

15  decide.

16      And then you also ask me to look at guideline

17  3E1.1, particularly Application Note 2, which clearly states

18  that the two-level reduction for acceptance of responsibility

19  is available even though the defendant may have gone to

20  trial.

21      And I agree with all of you.  I think the total

22  offense level is a 32.  And we all agree the criminal history

23  category is a Category 6.  Is that right?

24      MS. PILLAY:  Yes, your Honor.

25      MR. BRINDLEY:  Yes, your Honor.  Because of the

1    career offender it goes to Category 6 automatically.

2         THE COURT:  Now, in your objections you also raise

3    another issue.  And you raise the issue that the aggravated

4    -- that the armed career offender status is inappropriate.

5         MR. BRINDLEY:  Yes.

6         THE COURT:  There's one of the three predicate

7    offenses, and that is the offense in 2002 for a UUW was --

8         MR. BRINDLEY:  Yes.

9         THE COURT:  -- is not appropriately considered.

10   And you discuss the Kirkland case, which began -- well, let

11   me back up.

12        You discuss the Kirkland case, which holds that in

13   determining whether a criminal conviction is a violent

14   felony, the Court look only at the fact of the conviction and

15   the statutory definition of the crime.  And this is referred

16   to as the formal categorical approach.

17        You ask the Court to consider the modified

18   categorical approach, which was developed thereafter, and

19   that -- that is applied when the crime has multiple methods

20   of conviction, each with its own elements.  This allows the

21   Court to look at the limited class of documents, that is, the

22   indictment, the jury instructions, to determine which of the

23   elements of a so-called divisible statute are met.

24        And you attached a copy of the transcript of that

25   2002 conviction which seems to argue -- or seems to support

1    the proposition that Mr. Myles pled guilty to a UUW charge.

2          MR. BRINDLEY:  Rather than aggravated discharge,

3    which is what had been listed before, Judge.

4          THE COURT:  Right.

5          And that was one of the four charges -- aggravated

6    discharge is one of the four charges that he was facing, and

7    you argue that he didn't plead guilty to that.  Therefore,

8    under the modified categorical approach this should not be

9    construed as a crime of violence --

10          MR. BRINDLEY:  Right.

11          THE COURT:  -- pardon me, a violent felony.  And,

12    therefore, the armed career offender category does not

13    obtain.  Did I state your argument correctly?

14          MR. BRINDLEY:  You do, Judge, yes.

15          THE COURT:  Okay.

16          The problem with that is this:  I do believe -- and

17    then the government provided me with some conviction material

18    as well.

19          MS. PILLAY:  Yes, your Honor.

20          THE COURT:  And the conviction material you

21    provided, Ms. Pillay, seems to suggest that the 2000 -- does

22    seem to support that the 2000 conviction was for a plea to

23    Count 2, which was for a UUW charge.

24          MS. PILLAY:  That's correct, your Honor.

25          THE COURT:  The problem with that is this:  That

1    the UUW statute -- and that can be found at 720 ILCS 5/24-1

2    -- contains 13 different methods by which that statute can be

3    violated, and some of those are clearly violent felonies.

4         In your papers you just assume that he was

5    convicted of a felony UUW, but it's unclear, both from the

6    transcript and from the charging and conviction documents,

7    which of those 13 components of the UUW statute he was

8    convicted of.

9         MR. BRINDLEY:  That's right, Judge.  And I think

10   that that's part of the reason why it can't count.

11        The case law on this -- and I don't think the

12   government disagrees with me -- indicates that when it comes

13   to predicates for Armed Career Criminal Act, it must be

14   unambiguous that it is indeed.

15        THE COURT:  I see.

16        So you're saying the fact that it could not have

17   been a violent felony requires it to be considered as a

18   non-violent -- as a non-predicate offense?

19        MR. BRINDLEY:  I think that's the state of the law,

20   yes, Judge.

21        THE COURT:  Do you agree with that, Ms. Pillay?

22        MS. PILLAY:  I do, your Honor.

23        THE COURT:  Very well.

24        Okay.  Then I find that the total offense level is

25   a total offense Level 32.  I find that the criminal history

1    category is a Category 6. I find that the defendant does not

2    qualify as an armed career criminal under -- 4B1.4?

3           MS. PILLAY: Correct, your Honor.

4           THE COURT: I think that's right.

5           MS. PILLAY: I think that's right.

6           Your Honor, if I can for the record, just to be

7    clear, for your Honor's sake, the defendant actually has been

8    convicted of four potential predicates for armed career

9    criminal. One of them -- we just discussed that one of them

10   no longer counts, so we're now down to three.

11          But it is true that the very first conviction, the

12   1988 conviction for robbery, is not eligible under the ACC

13   statute because the defendant's rights were reinstated by the

14   State of Illinois under United States versus Buckmeyer. So

15   just for the record, that is the reason the additional third

16   conviction does not count.

17          THE COURT: So we have an exception to what

18   otherwise would be an applicable predicate offense?

19          MS. PILLAY: That's correct, your Honor.

20          THE COURT: I respect your being so forthright.

21   Thank you.

22          MS. PILLAY: Certainly, your Honor.

23          THE COURT: All right. So I'll persist in my

24   finding that Mr. Myles has not obtained the status of an

25   armed criminal -- armed career criminal but that he is

1  properly characterized within the status of the career

2  criminal.  Okay?

3         Did I adequately summarize your positions, both as

4  to the sentencing factors, Ms. Pillay, and the guidelines?

5         MS. PILLAY:  Yes, your Honor.

6         I will say, though, that the government's position

7  is actually a recommendation at the high end of the

8  guidelines range and not simply within.

9         THE COURT:  I see.  Okay.

10         MS. PILLAY:  Thank you.

11         MR. BRINDLEY:  And, Judge, there's one more thing

12  that I came across yesterday --

13         THE COURT:  Let me ask you this same question,

14  though:  Have I accurately stated what's in your papers?

15         MR. BRINDLEY:  Yes, you have stated everything that

16  we filed, Judge.

17         I have one other objection that doesn't affect the

18  guideline range but I think is an inaccuracy in the report

19  that I noted.  It's on Page 10 and it's Paragraph 48.  It

20  refers to Mr. Myles' conviction on 10/18, 1994.

21         It appears to me that -- this was paroled out

22  10/11, 1995.  It appears that this is over ten years old, and

23  unless I'm missing something, Judge, I don't think that he

24  should get the three points.

25         I looked back at the government's version of the

1    offense and they had agreed that this should be a zero.  I'm

2    not sure why it's not in the --

3                  THE COURT:  That doesn't change the criminal

4    history category, though, does it?

5                  MR. BRINDLEY:  No, because the criminal history

6    category --

7                  THE COURT:  That's right.

8                  MR. BRINDLEY:  -- is governed by career offender,

9    Judge.

10                 THE COURT:  Career offender, that's right.

11                 MR. BRINDLEY:  It would change it to a Category 4

12   rather than a 5, I believe, if not for career offender.  But

13   we have the career offender in place, so he technically

14   qualifies.  But I do think -- I think the three points is

15   incorrect, and I would like to get that correction made

16   unless there's --

17                 THE COURT:  Mr. Grooms?

18                 PROBATION OFFICER:  Your Honor, the date -- defense

19   counsel is pointing out the date of conviction, but to

20   determine whether or not three points are applicable, it's

21   the date he was paroled from.

22                 THE COURT:  I see.  The date that the sentence was

23   completed?

24                 PROBATION OFFICER:  So I believe it's just within

25   the 15-year period.

```
1              MR. BRINDLEY:  Isn't it --
2              MS. PILLAY:  Is it 15 years from the time of
3    sentencing or the time of --
4              THE COURT:  The time of termination of parole.
5              MS. PILLAY:  Up to when?  To this time of
6    sentencing, so to today?
7              PROBATION OFFICER:  To the time the offense was
8    committed.
9              MS. PILLAY:  Got it.  So December 2009 is the
10   relevant time and --
11             PROBATION OFFICER:  There is also --
12             MS. PILLAY:  Right, December 2007 is the reason --
13   is the time of the first offense.
14             MR. BRINDLEY:  That's what it is, Judge.  I
15   understand now because there's an '07 offense that we didn't
16   spend much time on.  I understand.
17             THE COURT:  Right.
18             Okay.  So the criminal history category is a
19   Category 6?
20             MR. BRINDLEY:  It's a Category 6 because of the
21   career offender.  It would be a 5 without it, Judge.
22             THE COURT:  But the criminal history points are
23   accurate as reflected in the presentence investigation
24   report?
25             MR. BRINDLEY:  It appears so, based on the
```

1  explanation, yes, Judge.

2  THE COURT:  Very well.  Okay.

3  Do you want to make some comments regarding

4  sentencing, Mr. Brindley?

5  MR. BRINDLEY:  I do, your Honor.

6  First, with respect to Section 3553, I would like

7  to begin with a brief statement about the first thing I think

8  that I reference in my memorandum.

9  Under the technical requirements of the guidelines,

10  the government has to move for the defendant to receive the

11  third point for acceptance of responsibility.  That's the

12  requirements of the guidelines.

13  However, under Section 3553 your Honor can consider

14  the circumstances and make a determination about whether or

15  not it would be appropriate to effectively make such a

16  reduction in Mr. Myles' case.

17  Now, as your Honor knows and likely recalls, before

18  his trial Mr. Myles had requested to enter a conditional plea

19  of guilty to both Counts 1 and 2 while keeping his right to

20  appeal some pretrial rulings.

21  The government then refused to agree to a

22  conditional plea which, as we told your Honor before the

23  trial, compelled us to go to trial and proceed as we did with

24  a complete omission from the beginning of the case on --

25  admission, I should say, to Counts 1 and 2 and Mr. Myles'

1    guilt.

2              But well before the trial began and during the

3    trial Mr. Myles continually professed his guilt as to all

4    counts of conviction.  And I think, practically speaking, he

5    did just as much as he could to admit guilt on those counts

6    and did it as long before trial as other defendants who

7    received the third point, but because --

8              THE COURT:  How would you respond to Ms. Pillay's

9    assertion that the government still was then put to the

10   burden of preparing and presenting trial?

11             MR. BRINDLEY:  I guess my response to that, Judge,

12   is that that was sort of the government's own prerogative.

13   He offered to plead guilty to these things and only keep his

14   appellate rights.  They didn't want him to be able to do

15   that.

16             THE COURT:  Do you have any authority where the

17   defendant has some right to select what he's going to be

18   charged with?

19             Isn't it the government's prerogative to file

20   charges and --

21             MR. BRINDLEY:  Of course.

22             THE COURT:  Yes.

23             And isn't the government still required to present

24   evidence at trial regardless of whether or not he pled to one

25   case and was found guilty -- found not guilty on another

1    count?

2              MR. BRINDLEY:  Yes.  I'm not disagreeing with that,

3    Judge.

4              I'm saying it is unique circumstances where a

5    defendant goes to trial but does indeed admit before the

6    trial that he's going to say that he did it, and in opening

7    statement and on the stand only say that he did it --

8              THE COURT:  I thought that you were arguing that it

9    was the government's fault because they didn't present a plea

10   agreement that the defendant thought was proper.

11             MR. BRINDLEY:  I'm not saying that they're -- I'm

12   not saying they did anything that's blameworthy, Judge.  I'm

13   only saying that the only reason he went to trial at all and

14   those two counts were included, is what we told your Honor:

15   We wanted to preserve his appellate rights on those issues.

16   And we did that for that reason.

17             But in terms of what acceptance of responsibility

18   means and timely acceptance of responsibility means, he did

19   the things that other defendants do in a timely manner in

20   terms of saying that he did it, telling your Honor that he

21   did it, that he was going to say that he did it.

22             THE COURT:  And he got a two-point reduction for

23   that.

24             MR. BRINDLEY:  He did.

25             But under the unique circumstances, Judge, I --

1    what I would say is effectively a slight reduction, perhaps

2    equivalent to what would be one level, might be appropriate

3    for consideration by your Honor when determining the

4    appropriate sentence.

5              THE COURT:  Okay.

6              MR. BRINDLEY:  Secondly, as your Honor knows, the

7    Sentencing Commission voted, as indicated in the press

8    release of January 9th of this year, in favor of reducing

9    drug guidelines across the board.

10             THE COURT:  A little slower.

11             MR. BRINDLEY:  Oh, I'm sorry, Judge.

12             Reducing drug guidelines by two levels across the

13   board.  I know your Honor is aware of that.  And that would

14   certainly apply to Mr. Myles as a drug offender if it not

15   were for the -- had it not been for the career offender

16   issue.

17             And if that two levels reduction happened, Judge,

18   he would go from what I believe is --

19             THE COURT:  24 minus two minus two.  To a 20?

20             MR. BRINDLEY:  He would be at a Level 20 and a

21   Category 5 without a career offender, and that's -- 63 to

22   78 months is what his sentence would be.  That's what's

23   appropriate for the offense conduct if not for the career

24   offender.

25             And I think that -- looking at what it would be

1    without the career offender I think provides a good lens

2    through which to try to determine what the appropriate

3    sentence in this case is.  Because for Mr. Myles, the career

4    offender -- ultimately when looking at 63 months on the low

5    end, going up to 210 to 262, we're tripling -- nearly

6    quadrupling the sentence, and it is just a massive increase.

7            And while Mr. Myles' criminal history -- I'm not

8    trying to say it doesn't require a sentence above what the

9    basic guideline is, Judge; it does.  I think that such a

10   massive change is too much, particularly when we consider how

11   drug addiction fits in with the kinds of convictions that

12   Mr. Myles has.

13           And when we look at those convictions, I think the

14   criminal history generated by a life-long addict is basically

15   what appears to us.  We have drug possession charges, there's

16   some attempted thefts and robberies, obtaining money

17   presumably to buy additional drugs, and there's many small

18   arrests, in addition, for small-time drug incidents.  All of

19   these things are consistent with somebody who is sort of

20   caught up in the desperate grip of this addiction, which took

21   Mr. Myles at a very early age, around the age of 17, Judge,

22   and he's struggled with it ever since.

23           I think Mr. Myles is in some ways a victim of the

24   very drug trade that he's furthering when he committed the

25   offense.  So he's both an offender and a victim at the same

1  time.

2            And I think he's here mainly because when you

3  consider what he's like from the letters we see from his

4  family, he's here mainly because of the grip that heroin has

5  taken.

6            I think a defendant who's dealing -- who's engaged

7  in drug-dealing activity like what's in this case but isn't

8  doing it for profit, was doing it to further an addiction,

9  which basically is what I think the evidence shows here, is a

10  defendant who deserves a sentence mitigated below the

11  dictates of the guidelines.

12            We're talking 210 to 262 months.  That is a massive

13  sentence that would be appropriate for someone who has made a

14  lavish profit from the drug trade.  And sentences are imposed

15  on those people within that range all the time.  And I think

16  drug addiction has to be a mitigating factor to be considered

17  here.

18            I would submit, your Honor, I think heroin

19  addiction -- probably your Honor has seen it as well -- it

20  may be one of the worst or arguably the worst that can come

21  about.  It creates the desires, it creates a desperation, it

22  creates the physical suffering.  And the lengths that it

23  leads people to stoop I think illustrates how it takes

24  control of a person's life and wreaks havoc on the basic

25  power of will, and I think that's happened here.

1    I think it's diminished willpower created by

2    addiction that we know is at work here, as described -- and

3    one of the letters talked about the addiction in detail,

4    Judge.  And I think the career offender guideline doesn't

5    take into account addiction; it's a very broad category.

6    THE COURT:  I think the career offender status

7    takes into account protection to the public.

8    MR. BRINDLEY:  It does, Judge.  Absolutely it does.

9    And I'll talk about that in just a second.

10    But when you look at the career offender range that

11    Mr. Myles is facing, somebody who had committed the same

12    offenses as Mr. Myles, in terms of possessing the firearm and

13    having the 17 grams for distribution in his home, if that

14    person had had much more serious prior convictions, attempted

15    murder, murder, rape, those kind of things, that person would

16    face the same guideline range as Mr. Myles.  It wouldn't be

17    any different under the way the career offender works.

18    And that's why I think, Judge, when you consider

19    the wide spectrum and the need to avoid disparity of what the

20    career offender guideline encompasses, it's appropriate to

21    decrease Mr. Myles' sentence to something, in light of the

22    addiction, that's below the recommended guideline range.

23    Mr. Myles certainly -- in terms of protecting the

24    public, Judge, there's prior convictions where Mr. Myles had

25    made threats and overtures to try to get money to buy drugs.

1    That was basically a count for his robbery conviction.

2            He did get into a struggle with this guy he was

3    getting drugs from.  The guy got shot in the foot, that's

4    true, and that's where he pled to the UUW.  But, your Honor,

5    those -- all of those things, I think, can be rooted in the

6    problem of drug addiction.

7            If you look at what the guidelines -- I guess I

8    just talked about what the guideline range would be without

9    the career offender.  When it comes to deterrence, I think

10   there's no doubt that Mr. Myles' prior history and his

11   addiction itself and his persistence creates a concern about

12   deterrence.  I agree with that.

13           He's been in and out of the system for a long time.

14   But he's never faced the prospect of such a significant

15   sentence at any time.  I think the greatest sentence he

16   received was -- I think he got a seven-year sentence in

17   Illinois and would have served, I think, about three years

18   for that.

19           I think the fear, that the prospect of a more

20   significant sentence like what we're looking at here,

21   provides the most powerful kind of deterrence.  And I think a

22   sentence of approximately 120 months would be, by far, the

23   most daunting he's ever faced when we know he's going to

24   serve 85 percent of that, at least.

25           I don't think there's any basis on which to find

1  that 120 months would be insufficient to deter him.  I don't

2  know what evidence there would be to say that it would be in

3  light of the limited sentences he's faced in the past.

4  And also, when you consider -- I think the same

5  logic applies to incapacitation and rehabilitation.  When we

6  take his age into consideration, the likelihood of further

7  offenses certainly diminishes because he's not getting any

8  younger and he's already at a fairly advanced age.

9  Now, of course, we take -- in 2010 he committed

10 this offense.  So that's true.  But I think all of the

11 studies have indicated that as age advances to the place

12 where Mr. Myles is and going forward, the likelihood of

13 recidivism goes down.

14 I think when we look at the seriousness of the

15 offense, possession of a firearm by a felon is indeed

16 serious, and preparing 17 grams of heroin for sale is

17 serious.  Nobody disputes that.  But when you look at what

18 the guideline would be without career offender, which we were

19 talking about before, it's basically five years on the low

20 end.  And you see the offense is not serious enough by itself

21 to warrant the sentence the government seeks.

22 And even if we take into account his background, if

23 we get some kind of a reduction for addiction that's playing

24 a role here, I think that would be appropriate due to the

25 vast disparity between what career offender says and what the

1  actual offense conduct would be in terms of an appropriate
2  sentence.

3          I think when prior convictions like Mr. Myles'
4  prior convictions that he has turns simple possession of a
5  gun and sale of 17 grams of heroin or intent to sell 17 grams
6  of heroin, that translates automatically into a ten-year
7  sentence.  I think that promotes both fear and respect for
8  the law, because when you ask your average person offender,
9  like a person out on the streets involved in drugs, well, if
10  you got 17 grams of heroin and a pistol, they're not going to
11  say they're automatically going to get ten years.  But if
12  they know that this kind of criminal history will hit you
13  with ten years automatically, I think that sends a message,
14  Judge.  And I think it sends enough of a message that we
15  don't have to do more, and that doing more would be greater
16  than necessary.

17          In conclusion, Judge, I think it's basically fair
18  to say that Mr. Myles' entire adult life has been plagued by
19  a physical and emotional struggle with heroin.  He's clean
20  now.  He's been in custody for a significant period already.
21  And if he were to get the sentence I'm asking for, he would
22  be clean for a long time.

23          I think he's making progress with the certificates
24  we see, the work he's doing in prison, the G.E.D.  And a
25  sentence of 120 months I think gives him a life to look

1    forward to and I think gives him a motivation to keep

2    improving and doing better to break the addiction.  I do

3    think that's important.

4         On the other hand, I think a devastating sentence

5    -- if we say 262 months, which is the high end of this

6    guideline, I think that can -- a sentence of that magnitude I

7    think would curtail hope at his age and I think give him less

8    motivation and less incentive.

9         And so I think we need something less than the

10   guideline range.  I've asked for a sentence in the range of

11   120 to 144 months, Judge, and I ask you to use your

12   discretion to take these things into consideration.

13             THE COURT:  Thank you, Mr. Brindley.

14             Ms. Pillay?

15             MS. PILLAY:  Thank you, your Honor.

16        As I stated before, the government is actually

17   seeking a high end of the guidelines range sentence, and

18   there's a number of reasons for that, a lot of which was set

19   forth in the government's position paper.

20        So let's start with the nature and characteristics

21   of this offense.  Despite being a felon with a significant

22   criminal history and having spent years in an Illinois state

23   prison, in December of 2007 the defendant was caught with a

24   fully loaded .45-caliber semi-automatic handgun.  It's a very

25   dangerous weapon, your Honor.

1       And notably, to prevent the cops from finding that

2  gun, he was combative and he resisted arrest and, in fact,

3  the cops had to wrestle him to the ground in order to seize

4  this dangerous weapon, which was hidden in the back of his

5  pants.

6       Now, he was arrested and charged with this offense,

7  with a UUW, but he was released pretrial.  So while on

8  pretrial release from that charge, the -- a separate set of

9  Chicago police officers executed a search warrant based on

10  the information from a John Doe.  And when they executed the

11  search warrant they found the defendant packaging heroin for

12  distribution at his kitchen table and they found a

13  .22-caliber fully loaded gun under his mattress.

14       Now, I also note in this house, this house he lived

15  in with his mother, his mother who has taken care of him his

16  whole life, his mother who was working the entire time, they

17  also found another gun in the basement, admittedly in a

18  common area, which is why it wasn't charged, but it was

19  hidden in a pinball machine.

20       This defendant -- this offense conduct is very

21  serious, especially in light of his criminal history.  On two

22  occasions he's found with a gun.  On one of them he's under

23  court order not to commit any crimes and he's just packaging

24  heroin at his kitchen table.

25       Looking at his history, he really is a violent and

1    unrepentant career criminal.  I don't agree with this

2    assessment that his entire history is based solely on his

3    addiction.

4              THE COURT:  Say that again?  I don't agree --

5              MS. PILLAY:  I don't agree that his entire criminal

6    history is based solely on his addiction.  It just doesn't

7    make sense with the amount of violence involved.

8              THE COURT:  It's clear his criminal history

9    certainly takes into account the career offender status that

10   has been enacted.

11             MS. PILLAY:  Agreed, your Honor.

12             And indeed, you know, even though he's not an armed

13   career criminal under the statute for the reasons we've

14   stated, his conduct fits into that statute, quite clearly.

15             As your Honor pointed out, he actually did shoot

16   somebody in the foot, even though he ultimately pled to the

17   UUW.  He was charged with, and the conduct shows that he did

18   an aggravated discharge of a firearm.

19             He committed a robbery, which was a predicate

20   offense.  The only reason that doesn't count is for the

21   reasons we've stated under certain laws in Illinois.

22             So as detailed in the position paper, the defendant

23   really has no respect for the law because a lot of times he's

24   caught doing this stuff while he's under court order not to,

25   under parole or probation or on pretrial release.

1    So regardless of all of these court orders to stay

2    out of trouble, he's caught time and again involved in

3    violent and in narcotics related offenses.

4    He really just isn't a user. He's a dealer. His

5    1992 conviction involved him selling heroin, and he was

6    caught with a large bag containing numerous tinfoil packets.

7    That is not consistent with simply a user.

8    In '97 he received a seven-year sentence because he

9    sold cocaine to a confidential source on two occasions. And

10   during the course of that investigation the cops searched his

11   motel room and they found an additional five grams of heroin.

12   That's a distribution quantity, your Honor.

13   For heroin, a user quantity is approximately

14   .1 grams. Your Honor knows that very well. That's 50 user

15   quantities. That's not a user quantity; that's a

16   distribution quantity. If he's using that much heroin at any

17   one time, he would have overdosed years ago.

18   Let's fast-forward to 2009, when the cops searched

19   his house in this instant case and they recovered 17 grams of

20   heroin. Again, clearly a distribution quantity. But the

21   reality of it is, when the cops came in they found heroin --

22   and your Honor saw the pictures at the trial -- they found

23   heroin all over the kitchen table, all over the floor. The

24   17 grams is simply all they were able to recover by scraping

25   it up. That certainly is not the full amount that was there.

1    That was just an effort of the defendant to somewhat hide or

2    get rid of some of this evidence when the cops came in the

3    door.

4            So -- and critical to that is the evidence of his

5    operation.  All over that kitchen table he had a grinder, he

6    had tons of aluminum foil squares that your Honor saw during

7    this trial, picture after picture after picture, boxes of

8    Baggies.  He had all of the paraphernalia that a legitimate

9    distributor, dealer uses.  And it's not just to deal with his

10   friends, as he claims.  That doesn't make any sense in this

11   context, your Honor.

12           So from the government's perspective, he's

13   legitimately a dealer and he's a violent, violent person.

14           And as we -- as your Honor commented in going over

15   the position paper, what's frustrating about this is he

16   really did have a supportive childhood.  He seems to have a

17   really lovely family who has always been there for him, who

18   worked hard.  And he's made this choice.  And maybe part of

19   it is his addiction, but you can't go that far; you can't

20   shoot someone in the foot, you can't hold somebody at

21   knifepoint to steal things.

22           You know, the letters -- when I read the letters,

23   he really does have an extraordinary support network, and

24   it's so shocking to see what he does in the face of that.

25   It's shocking to see what he does in the face of the court

1   orders that he completely disregards.  You know, he really is

2   a menace to society from the government's perspective.

3          You know, the Court is well aware of the

4   seriousness of this crime.  Your Honor quite eloquently

5   stated how important it is to recognize the explosive mix of

6   these guns and drugs.

7          And the defense counsel was commenting on the gun

8   and the drugs.  There are two guns here, your Honor, two guns

9   he's convicted of on two separate occasions in just a couple

10  of years.  And he's been a felon five times over at the time

11  he was found for each of those guns.

12         You know, for these reasons, I do think a sentence

13  at the high end of the career offender guidelines is

14  appropriate.

15         Thank you, your Honor.

16         THE COURT:  Thank you, Ms. Pillay.

17         Mr. Myles, you have the right to speak, the right

18  of allocution that's afforded anyone who is facing sentence

19  in a federal criminal courtroom.  You also have the right not

20  to speak.

21         Is there anything you would like to say, sir?

22         THE DEFENDANT:  Yes, your Honor.  Thank you for

23  giving me the opportunity to speak.

24         First and foremost, I want to apologize to the

25  government, to you, Judge.  I'm talking full responsibility

1  for everything that I've pled for, I was charged with.  I

2  thought --

3        (Brief pause.)

4        THE DEFENDANT:  I know I made a lot of bad choices

5  in my life.  I'm embarrassed.  I'm ashamed.

6        Yeah, I did come from a good family.  They were

7  always there for me.  I just -- I don't know -- I got off

8  into my addiction and I think it just put me in a situation

9  where I distanced myself.  I wouldn't get the help I needed

10  from my family because I felt like I wasn't ready.  That was

11  mostly all my life.  I think it started when I transferred.

12        I'm not here to make any excuses because the family

13  that I came from, I shouldn't have even been using drugs but

14  I got caught up, your Honor.

15        If I may, can I just say something to my mother,

16  please?

17        THE COURT:  Sure.

18        THE DEFENDANT:  Ma, I just want you to know I love

19  you.  You always there for me.  And whatever happens today,

20  I'm gonna be a better man.

21        You know, you asked me -- you asked me where you

22  went wrong.  You were the best mother a son could have.  I

23  love you and I'm going to stand firm on whatever happens

24  today.  I just wanted to let you know that.

25        THE COURT:  Thank you.

1    Anything further, Mr. Myles?

2    THE DEFENDANT:  I just ask your Honor, I just need

3    another chance.  I need the chance to be a productive

4    citizen.  I never gave myself the opportunity.  And I just --

5    I'm a lot older now.  I've had a lot of time to think, and I

6    just want to be a productive citizen.  And I know without the

7    drug usage I know I can be a productive citizen.

8    THE COURT:  Thank you.

9    Mr. Myles, in pronouncing a sentence I'm directed

10   to consider several factors.  Overall, I must impose a

11   sentence that's necessary but not greater than necessary to

12   promote respect for the law, provide just punishment, provide

13   adequate deterrence, provide protection to the public and

14   provide any treatment or training needed by you.

15   In making that determination I'm first to consider

16   the nature and history of the offense, the offenses in this

17   case that you have been convicted of and has been discussed

18   now repeatedly in here.  The combination of drugs and

19   firearms in our community and what its -- the destructive

20   effect it's having on our community is obvious.

21   And your conduct over almost your entire adult life

22   has been involved in both violence, violence in using

23   firearms and drugs, and there's clear evidence that you have

24   distributed drugs in connection with the use of firearms.

25   There's clear evidence that you have distributed

1    drugs as well, and to characterize your possession of drugs

2    as user amounts I don't think is reflected in the papers that

3    I've considered.

4           I'm also to consider your own personal history and

5    characteristics.  And contrary to many of the young men that

6    I'm obligated to pronounce sentence on, you did have some

7    significant advantages.

8           You had a loving and caring family, a very

9    supportive mother, given the advantage of a private

10    education.  It can't be said that you were pushed or drifted

11    at a teenage age into something over which you had no choice.

12    You were clearly empowered to make a choice.

13           But in considering further your own personal

14    history and characteristics and considering those factors

15    that must be served in pronouncing a sentence, the factor

16    that is most pronounced and obviously is the driving factor

17    in this room today is protection to the public, and the other

18    side of that coin, specific deterrence.

19           You have spent a significant amount of time in

20    prison.  Not anywhere near the time you're looking at now,

21    but still time that should have provided some kind of

22    deterrence.  It did not.

23           I accept what Mr. Brindley has said regarding your

24    narcotic addiction, your heroin addiction, as one of, if not

25    the driving force in your criminal misconduct.  But the fact

1    that somebody might be injured or killed because of your use

2    of a firearm or someone's life may be destroyed because of

3    your distribution of drugs, would be of no solace to those

4    persons, to explain to them that the reason that that

5    happened to them was that you needed the money to support

6    your habit.

7            The simple fact of the matter is that as you stand

8    here today you are a significant threat to this community.

9    And I think if you're honest with yourself and candid with

10   yourself, you would acknowledge that.  And I think any

11   sentence that has to be -- that is to be pronounced must,

12   first of all, recognize that.

13           The suggestion that had you been sentenced based on

14   an offense level that was calculated only by the amount of

15   drugs that were involved here, which would have produced a

16   total offense level of 20, a sentencing guideline range in

17   the area of 63 to 78 months, misses the point.

18           Our government, in enacting the career offender

19   status, obviously was concerned with more than individual

20   criminal misconduct.  It was concerned with criminal

21   misconduct that career -- over a course of time it was

22   concerned with criminal misconduct that the criminal had

23   adopted as a career.  And if anyone fits into that category,

24   Mr. Myles, it is you.

25           It might very well be that it is because of your

1   addiction, but the simple fact of the matter is the status of

2   an offender identified by that statute clearly includes you

3   and your past conduct.

4            And so, to say that the offense without criminal

5   career status would have been -- could have been around --

6   produced a guideline range at the low end of around five

7   years, is to miss the point.  The point is that you are being

8   sentenced in part because of your past and it's something

9   that has to be considered.

10            On the other side of that coin, I do recognize the

11   changing view that we do have regarding narcotics, and the

12   changing view we have regarding narcotics particularly in

13   regards to sentencing.  And you pointed out the Justice

14   Department's most recent pronouncements in that regard,

15   Mr. Brindley.  Within the last few years we've had a

16   reduction in the suggested ratio of crack to powder cocaine

17   to non-crack cocaine from 100 to 1 to 18 to 1, and that

18   certainly is a factor.

19            I also recognize that but for the career offender

20   status here -- because of the career offender status you're

21   facing an advisory range of about two-and-a-half times the

22   range you would have faced had you not been identified as a

23   career offender.

24            Mr. Brindley's point regarding a sustained period

25   of incarceration would have an effect on rehabilitation and

1    incapacitating you regarding your addiction, and that point

2    is certainly well taken.

3           In addition, I'm aware of the hardship that this

4    will produce on your family, particularly your mother, for a

5    long period of incarceration.  But balancing all of the 3553

6    factors, it's apparent that a significant period of

7    incarceration has to be imposed, particularly to protect the

8    public.

9           Therefore, pursuant to the Sentencing Reform Act of

10   1984, it is the judgment of this Court that the defendant,

11   Isaac Myles, shall be committed to the custody of the Bureau

12   of Prisons for a term of 180 months on Counts 1, 2 and 4.

13   And those terms will be served concurrently.

14          Mr. Brindley has pointed out your age when you

15   would be released.  You will still be in your 50s at this

16   time, when credit is given for time served, according to my

17   calculations.  And that still, a sentence of this nature,

18   contrary to a sentence within the guideline range, should

19   still give you an opportunity to contemplate the positive

20   change you told me you're going to make and the things you

21   want to do when you're released from custody.

22          I strongly recommend to the Bureau of Prisons that

23   you participate in a residential drug abuse program offered

24   by the Bureau of Prisons.  I think you've acknowledged that

25   you think you could benefit from that.

1          THE DEFENDANT:  Yes.

2          THE COURT:  I find that you do not have the ability

3    to pay a fine, and so no fine will be imposed, nor will the

4    cost of incarceration or supervision be imposed.

5          A special assessment of $300 is imposed, and that

6    is payable and due immediately.

7          Upon release from imprisonment you should be placed

8    on a period of supervised release for a term of five years on

9    Counts 1, 4 and 6 and on Count 2, all to be served

10   concurrently.

11         Within 72 hours of release from prison you shall

12   report in person to the probation office in the district

13   where you are released.

14         While on supervised release you shall not commit

15   any other federal, state or local crimes.

16         You shall comply with the standard conditions that

17   have been adopted by this Court.

18         You shall also refrain from the unlawful use of any

19   controlled substance.

20         You shall submit to one drug test within 15 days of

21   release from prison and random drug tests thereafter, to be

22   conducted by the United States probation officer to whom you

23   are assigned, not to exceed 104 tests per year.

24         You shall cooperate in the collection of a sample

25   of DNA from your body if required by statute.

1    You shall not possess a firearm or other

2    destructive device.

3    Ms. Pillay's comments were well taken, as pointed

4    out in the Probation Department -- in the presentence

5    investigation report.  Both of these offenses involve the use

6    of firearms, a very dangerous firearm, and both of these

7    offenses involve the use of firearms arguably connected with

8    the distribution of narcotics.

9    Upon release from prison, as a term of supervision

10   you shall participate in a drug and alcohol abuse program,

11   which may include urine testing at the direction of the

12   probation officer to whom you are assigned.

13   Mr. Myles, you can appeal your conviction if you

14   believe that your guilty plea was somehow unlawful or

15   involuntary, or if you believe there was some other

16   fundamental defects in the proceedings that resulted in your

17   convictions at trial or during your guilty plea.

18   You also have a statutory right to appeal your

19   sentence, particularly if you believe your sentence is

20   contrary to the law.

21   An appellate waiver is not an issue here, I take

22   it?

23   MR. BRINDLEY:  No, your Honor.

24   THE COURT:  You can apply to appeal in what the law

25   calls in forma pauperis.  That means that if you qualify, the

1    cost of preparing and filing an appeal will be waived, or

2    forgiven.

3          The Clerk of the Court will prepare and file a

4    notice of appeal upon your request.  With very few

5    exceptions, any notice of appeal must be filed within 14 days

6    of the entry of this judgment.

7          Do you understand what I've just said?

8          THE DEFENDANT:  Yes.

9          MR. BRINDLEY:  And, Judge, I've already agreed to

10   file that notice of appeal.

11         THE COURT:  I will direct you, Mr. Brindley, to --

12   I'll ask you to meet and confer with Mr. Myles.  If it's his

13   intention to file a notice of appeal, that you will assist

14   him in doing that.

15         MR. BRINDLEY:  Yes, your Honor, I will do that.

16         THE COURT:  Anything else, Ms. Pillay?

17         MS. PILLAY:  No, your Honor.

18         THE COURT:  Mr. Brindley?

19         MR. BRINDLEY:  No, your Honor.

20         You mentioned the drug treatment program.  That's

21   the only thing I had.

22         THE COURT:  Mr. Myles, you don't have much to show

23   for your life.  It has been marked with violence and drug use

24   and drug distribution.

25         On the other hand, just reading this presentence

1    investigation report and considering the background that you

2    came from, the home that you had, it's obvious that there are

3    an awful lot of -- and reading those letters that were

4    submitted on your behalf, it's obvious there's an awful lot

5    of pluses in your personality, in your character.

6              It's also obvious that you're a very bright guy.  I

7    really urge you to take this period in your life and consider

8    what positive things you can do with it and come out of this

9    a better person.  Good luck to you.

10             MR. BRINDLEY:  Judge, can I ask him one question

11   before we go?

12             THE COURT:  Sure.

13          (Discussion had off the record.)

14             MR. BRINDLEY:  Your Honor, if the Court could

15   recommend the closest facility to the Chicago area?

16             THE COURT:  I will.  Probably Oxford, would you

17   say?

18             MR. BRINDLEY:  Yes, Judge, that would be the best.

19   They have the drug program there.

20             THE COURT:  I strongly recommend to the Bureau of

21   Prisons, in light of his strong family support, particularly

22   in light of the age of his mom, that he be assigned to a

23   Bureau of Prisons facility as close to the Chicagoland area

24   as possible.  And I specifically request that he be assigned

25   to the Bureau of Prisons facility in Oxford, Wisconsin.

1          Good luck to you.

2          THE DEFENDANT:  Thank you.

3          MR. BRINDLEY:  Thank you, your Honor.

4          MS. PILLAY:  Thank you, your Honor.

5          THE COURT:  You're welcome.

6          Thank you for coming in.

7          MRS. DAPHNE MYLES:  You're welcome, your Honor.

8      (Which were all the proceedings heard.)

9                    CERTIFICATE

10     I certify that the foregoing is a correct transcript

11  from the record of proceedings in the above-entitled matter.

12

13   /s/ *Mary M. Hacker*                 *April 2, 2014*

14  _____      _____
    Mary M. Hacker                  Date
15  Official Court Reporter

16

17

18

19

20

21

22

23

24

25